Edwin D. BOULWARE et al.,
Plaintiffs,

v.

Victor F. BATTAGLIA et al.,
Defendants.

Civ. A. No. 3869.

United States District Court,
D. Delaware.

June 26, 1972.

---

35. Plaintiff's Exhibit #33 and Safety Rules ##196–201.

Emmett J. Conte, Jr., Wilmington, Del., for plaintiffs.

Andrew B. Kirkpatrick, Jr., and Walter L. Pepperman, II, of Morris, Nichols Arsht & Tunnell, Wilmington, Del., for defendants.

## OPINION

CALEB M. WRIGHT, Chief Judge.

During the period in which the incidents underlying this action occurred, the five plaintiffs were police officers with the City of Wilmington, Department of Public Safety, Bureau of Police (Department). The defendants were and continue to be the City Solicitor, the Commissioner of Public Safety, the Chief of Police and seven other police officers for the City of Wilmington. The plaintiffs brought this action seeking a judgment for certain alleged violations of their federal constitutional and statutory rights in the course of a disciplinary proceeding prosecuted by the defendants concerning the plaintiffs' performance of their duties as police officers. Raising numerous factual allegations of infringements of constitutional and civil rights, the plaintiffs' complaint relied upon three federal statutes: 42 U.S.C. § 1983, 42 U.S.C. § 1985 and 47 U.S.C. § 605. In a previous opinion, the Court granted the defendants' motion to dismiss all claims under the latter two statutes, and held that the allegations charged in the complaint under 42 U.S.C. § 1983 were sufficient to state a cause of action.[1] After extensive discovery, the case is presently before the Court on the defendants' motion for summary judgment directed toward the remaining 42 U.S.C. § 1983 claims.

As noted in the prior opinion, jurisdiction is based on 28 U.S.C. § 1343(3). The defendants have argued that jurisdiction is not conferred by 28 U.S.C. § 1343(3) because the plaintiffs' claims are predicated upon property rights, see Tichon v. Harder, 438 F.2d 1396 (2nd Cir. 1971). However, the Supreme Court in the recently decided case, Lynch v. Household Finance Corp., 405 U.S. 538, 92 S.Ct. 1113, 31 L.Ed.2d 424 (1972), rejected the contention that 28 U.S.C. § 1343(3) supported a jurisdictional distinction between personal liberties and property rights. The Supreme Court's observation regarding the impossibility of applying the *Tichon* rule because no cognizable dichotomy exists between personal and property rights is especially pertinent in this case since the plaintiffs' underlying claim arises from their employment, while the self-incrimination, search and seizure and procedural due process rights they raise are personal in nature.

■ To prevail on a motion for summary judgment, the moving party must

1. The Court's earlier opinion is reported at 327 F.Supp. 368 (1971).

assume the burden of proving that there are no disputed issues of material fact and that it is entitled to judgment on all matters of law. F.R.Civ.P. 56(c). See 6 Moore, Federal Practice ¶56.15 [3] (2nd Ed. 1971). Moreover, in cases raising federal constitutional claims, a court must rigorously insure against granting summary judgment when any doubt exists concerning disputed material facts. See Sindermann v. Perry, 430 F.2d 939, 943 (5th Cir. 1970).

## THE FACTS

In December 1968, four of the plaintiffs, Lieutenant Edwin D. Boulware (Boulware), Sergeant Lenox J. K. Smith (Smith), Patrolman Frank J. Shahan (Shahan), Patrolman Michael J. Maloney (Maloney) and the defendant, Patrolman Samuel P. Chickadel (Chickadel) comprised the Vice Squad of the Department. The fifth plaintiff, Joseph M. McNair (McNair), joined the Vice Squad in January 1969. These six men comprised the Vice Squad between January and March 1969.

In mid-March 1969, Chickadel informed certain of his superiors and the City Solicitor, Victor F. Battaglia (Battaglia) that two members of the Vice Squad, Smith and Shahan, were involved in a conspiracy to photograph Battaglia in a compromising position with a woman.

In essence, Chickadel stated that, in December in the presence of all the members of the Vice Squad, Smith related the contents of a meeting he had had with Emmett J. Conte, Jr., Esquire, in which they discussed a plan to place Battaglia in a compromising position with a female for purposes of obtaining pictures to use against the City Solicitor. Smith was to select the individuals to take the pictures at the appropriate time. This plan was discussed by members of the Vice Squad on several occasions between December 1968 and March 1969, and Shahan indicated a willingness to take the desired pictures. Chickadel maintained that although he was doubtful that the proposed conspiracy would be undertaken when it was initially presented, the recurring references to the plan and his inability to dissuade Shahan from joining it led Chickadel to conclude that the plan was likely to be implemented. This conclusion precipitated his reporting the conspiracy.

On Friday, April 11, 1969, the Office of the City Solicitor issued a subpoena directed to Chickadel requiring him to appear for questioning at the office of the City Solicitor on the following Monday. Although the subpoena did not indicate the nature of the inquiry, it is clear that Chickadel was apprised of the fact that the conspiracy which he had divulged would be investigated. During the weekend, Chickadel taped a series of telephone calls he made to and received from certain of the plaintiffs concerning his receipt of the subpoena and the possible subject matter of the Solicitor's investigation. The telephone calls were made and taped with the knowledge of Battaglia and in the presence of Sergeant Nicholas M. Valiante (Valiante), who had been assigend by Battaglia to observe Chickadel's actions. While there is some dispute concerning whether Chickadel recorded the conversations on his own initiative or at Battaglia's request, it is clear that the tapes were made in an effort to obtain corroboration of Chickadel's account of the prospective conspiracy.

On April 14, 1969, Chickadel testified before Battaglia, Stephen P. Cassarino, an assistant City Solicitor (Cassarino), William J. O'Rourke, Commissioner of Public Safety (O'Rourke), John T. McCool, Chief of Police (McCool), and then Police Captains James F. White (White) and Edward A. Sylwestrzuk (Sylwestrzuk) concerning the nature of the alleged plot and the plaintiffs' roles therein. After Chickadel had testified, the above listed individuals, all of whom are defendants with the exception of Cassarino, proceeded to interrogate each of the plaintiffs concerning the allegations asserted by Chickadel.

With the exception of the questioning of McNair, the interrogation of each of the plaintiffs was preceded by a description of the subject matter of the inquiry and a recitation of the *Miranda* warnings.[2] McNair was the first plaintiff interrogated and answered a number of questions prior to being informed of his rights and the nature of the investigation. After this initial questioning and at the request of Captain White, McNair was given his Miranda warnings and requested an opportunity to contact an attorney. The interrogation was delayed until McNair had procured as his counsel Harold Leshem, Esquire. During the balance of the McNair questioning and the interrogation of the other plaintiffs, each man had an attorney present in the room or available outside the room, or had consented to being questioned without his attorney present.[3]

After this initial questioning, the balance of the departmental investigation of Chickadel's accusations was conducted by Captains White and Sylwestrzuk, who had been assigned this responsibility by Chief McCool. On April 17, 1969, under the direction of and in the presence of White and Sylwestrzuk, each of the plaintiffs was confronted by Chickadel and his account of the alleged conspiracy. In each instance, Chickadel recounted his description of the conspiracy and detailed each plaintiff's role in or awareness of the proposed plan. At the conclusion of Chickadel's statement, each plaintiff was given the opportunity to respond. Smith, Shahan and Maloney indicated that they had no comment to make at that time,[4] although both Smith and Shahan stated that they intended to confer with their attorney. Asserting that Chickadel had not testified that Smith had discussed the matter in Boulware's presence, Lieutenant Boulware unequivocally denied any knowledge of the alleged plan. At his request, McNair's remarks were neither recorded nor transcribed; however, the subsequent testimony of Chickadel and White clearly evidence that they, at least, felt

2. The following excerpt from the Boulware transcript is exemplary of the warnings given:

CAPT. WHITE: I want to advise you of your rights, which you know as well as I do. You have a right to a lawyer. You have a right to a telephone call. You have a right to your lawyer being present. Anything you say can be used against you, and if it is evidence it will be used against you. You also have the right to remain mute and not say anything at all right now. Transcript of April 14, 1969 Interrogation of Boulware, p. 51.

The following excerpt from the Boulware questioning is similar to the explanations made on the record to the five plaintiffs:

BY MR. CASSARINO:

Q Lt. Boulware, I think we should advise you of the purpose of the investigation. I think we failed to do that. The office of the City Solicitor and the Department of Public Safety are investigating an alleged conspiracy involving members of the Department of Public Safety. The conspiracy is an attempt to accuse a City official, primarily Mr. Victor Battaglia, the City Solicitor, of misconduct, and it is an attempt to compromise him by setting him up with a woman and taking photographs of him. We have reason to believe that such a conspiracy does exist.

You have been subpoenaed as a witness. It is possible as a result of this investigation that criminal charges may be placed against members of the Department. It is also possible that departmental charges may be brought. Capt. White has advised you of your constitutional rights. With the purpose of this investigation in mind, do you have any knowledge of such a conspiracy, or would you like to still have an attorney? Id. at 52.

3. Prior to questioning Maloney and Shahan, the defendants offered to postpone the investigation to accommodate Mr. Leshem's having to depart to meet a previous commitment. Indicating that Mr. Leshem was their attorney, the two plaintiffs, nonetheless, consented to be questioned without counsel rather than defer the matter.

4. Patrolman Shahan stated that his demand to be confronted by his initial accusor had not been complied with and reiterated his request to hear the individual who had originally implicated him.

he had acknowledged an awareness of the conspiracy and implicated Shahan in it.

On April 18, 1969, White and Sylwestrzuk ordered each of the plaintiffs to submit written reports concerning any knowledge which they might have about the alleged plot. With the exception of Boulware, each plaintiff submitted a report indicating a. his attorney had advised him not to submit any statement, and b. he knew nothing further about the matter. Lieutenant Boulware merely denied any knowledge of the conspiracy.

Subsequently, on April 25, 1969, at the request of Captains White and Sylwestrzuk, Chickadel agreed to undergo a polygraph examination to confirm his account. The test was conducted by Sergeant William W. David, Delaware State Police, who determined on the basis of the examination that Chickadel evinced no indications of deception when questioned regarding his description of the conspiracy.

Concluding that their investigation indicated a strong probability that Chickadel's accusations were accurate, White and Sylwestrzuk preferred departmental charges against the five plaintiffs on May 2, 1969. The actual charges filed against the plaintiffs were "Conduct unbecoming an Officer"—Smith and Shahan, and "Neglecting to report to his Commanding Officer delinquency and dereliction of duty, conduct, disorder and neglect to the prejudice of good order, efficiency and discipline which he observes or which he has knowledge"— McNair, Boulware and Maloney. The specifications against Smith and Shahan were that they directly participated in a plan to place Battaglia in a compromising position with a female so photographs could be taken—Smith for formulating the plan and obtaining the photographer and Shahan for volunteering to take the pictures. The specifica-

tions against the latter three were that each man heard and was aware of discussions concerning the plan and failed to report the incidents.

On May 14, 1969, a hearing concerning the above cited departmental charges was held for each of the five plaintiffs. Then Captains Bozman, Turner and Shockley served as the Trial Board responsible for determining the accuracy of the preferred charges and recommending the appropriate disposition of the several cases. Emmett Conte, Jr., Esquire, was attorney for each of the five plaintiffs throughout these departmental hearings and Messrs. Wood and Fraczkowski, Assistant City Solicitors, served as the prosecution.[5] Shortly before the commencement of the hearings, each member of the Trial Board was provided with a report of the White-Sylwestrzuk investigation, and, at least, Captain Bozman made several references to matters contained therein during the course of the hearings. Each plaintiff was tried separately. Mr. Conte was afforded the opportunity to cross-examine each prosecution witness and each plaintiff was permitted to present testimony on his own behalf. In addition, the tape recordings of the April 17th interrogations by White and Sylwestrzuk and the telephone conversations between Chickadel and various of the plaintiffs were introduced. The transcript of the April 14th interrogation was not transcribed until December 8, 1971 and was therefore not a part of the record. However, since the investigation reports of White and Sylwestrzuk are not part of the record, the Court cannot ascertain what portions of the April 14th questioning, if any, were before the Trial Board.

On the day following the hearings, the Trial Board considered the evidence and unanimously concluded that the plaintiffs were guilty as charged. They recommended that the Chief and Commissioner so hold and sentence the plain-

---

5. It was the policy of the Department to utilize the personnel of the Solicitor's Office as prosecutors whenever a defendant in a departmental hearing was represented by counsel.

tiffs to punishments ranging from a reduction in rank from Sergeant to Patrolman with the six months on probation for Smith to an assignment of ten extra days duty without pay for Boulware and Maloney. The findings and recommendations of the Trial Board were subsequently reviewed and adopted by the Chief and the Commissioner, and the suggested discipline administered.

## THE ISSUES

To prevail on their § 1983 claims, the plaintiffs must prove that the defendants subjected them to a deprivation of rights guaranteed to them by the United States Constitution and federal laws. In its initial opinion, the Court, through a liberal construction of the plaintiffs' factual allegations, characterized the complaint as based upon the alleged deprivation of the constitutional rights to counsel, to not incriminate oneself, to due process of law, and to be free from unreasonable searches and seizures. The Court's discussion of the plaintiffs' cause of action focused upon the procedural due process aspects of the disciplinary action. This emphasis resulted from the ambiguities present in the

plaintiffs' pleadings and the nature of the relief sought by the complaint.[6] However, subsequent to this opinion and in response to interrogatories propounded by the defendants, the plaintiffs significantly clarified their contentions by correlating the factual allegations with the constitutional claims presented. The plaintiffs evidently raise a threefold challenge to the tactics and procedures utilized in the investigatory and adjudicatory phases of the disciplinary actions to which they were subjected. In chronological order, the arguments are:

1. Chickadel's recordation of certain phone calls between himself and certain of the plaintiffs violated the plaintiffs' right to be free from unreasonable searches and seizures;[7]

2. The departmental investigation, specifically being interrogated without receiving Miranda warnings and without assistance of counsel and being ordered to submit a departmental report concerning the alleged conspiracy, deprived the plaintiffs of their right to counsel and their right not to incriminate themselves;[8] and

---

6. Although the plaintiffs sought monetary damages, as well as injunctive relief restoring them to rank, status, privileges, etc., enjoyed prior to the disciplinary actions, it was not clear from the prayer for relief whether the plaintiffs were seeking damages for the specific deprivations of constitutional rights, e. g. freedom from unreasonable searches and seizures, as separate and apart from their effect on the disciplinary action taken against the plaintiffs.

7. Plaintiffs' response to the defendants' interrogatory requesting the factual basis for their allegation concerning a deprivation of the right to be free from unreasonable searches and seizures was: *The Right to Be Free From Unreasonable Searches and Seizures.*
"Plaintiffs were deprived of the right to be free from unreasonable searches and seizures by virtue of the transcription of certain telephone conversations between certain of the Plaintiffs and certain of the Defendants on or about April 11–14, 1969." Docket Item 24, p. 10.

8. The plaintiffs' interrogatory response on this issue was:

*The Right to Counsel And The Right Not to Incriminate Themselves.*
"Each Plaintiff was accused of being involved in a criminal conspiracy against the Defendant BATTAGLIA, and was advised at the time these accusations were made that criminal action would probably be initiated against each Plaintiff. These accusations were made on April 14, 1969, and each Plaintiff was subsequently interrogated as to the alleged conspiracy without having been advised of his Constitutional rights, specifically without being advised of his right to counsel to assist him during the interrogation which ensued. The same procedure was repeated on April 17, 1969, and accompanied by the same failure to advise as to Constitutional rights. Following the April 17, 1969 interrogation, each Plaintiff was ordered to provide the Bureau of Police with a written report or statement as to his alleged involvement in the alleged conspiracy. This order was given with full knowl-

3. The departmental adjudication denied the plaintiffs due process of the law through numerous procedural and substantive irregularities in the course of the Trial Board hearing and the review process.[9]

In addition to these contentions, in their brief opposing this summary judgment motion, the plaintiffs raised two additional claims. First, they allege that the proceedings instituted against the plaintiffs were not "departmental" in nature, but rather, were guided throughout by Battaglia under the color of his office and participated in by the remaining defendants for ulterior and personal motives ranging from anticipated promotion to a desire to interfere with a Vice Squad investigation of a relative of one of the defendants. Second, the plaintiffs have been unjustly accused of apparently criminal activity. These allegations appear to constitute further contentions pertinent to the plaintiffs' due process claims and will be discussed in conjunction with the Court's analysis of that argument.

On the basis of the facts contained in the depositions, interrogatories and transcribed records of the departmental proceedings, the defendants maintain that the plaintiffs were afforded the full panoply of constitutional rights to which they were entitled throughout the entire investigatory and adjudicatory process. The defendants' specific arguments regarding each of the alleged constitutional deprivations will be examined subsequently during the Court's discussion of the individual claims.

Citing what they assert are numerous material and disputed facts, the plaintiffs contend that summary judgment can not be granted. Moreover, they state that discovery is not yet complete and that pertinent facts may be educed in subsequent discovery efforts. In his brief opposing the instant motion for summary judgment, plaintiffs' counsel failed to illuminate his legal contentions. Failing to cite a single case to support any facet of his clients' numerous claims, counsel has placed an unwarranted burden upon the Court and made more difficult a meaningful analysis of the objections he raised to the defendants' legal arguments or of the existence of material factual disputes.

## SEARCH AND SEIZURE

The plaintiffs charge that the recordation of certain telephone calls between certain of themselves and Chickadel constituted a deprivation of their right to be free from unreasonable

---

edge that each Plaintiff had now retained counsel and that counsel had advised each Plaintiff to make no written or oral statement or report with reference to the matter without counsel's being present. In spite of this knowledge and explanation, each Plaintiff was ordered to submit a written statement or report and was refused the right to the assistance of counsel at this time." Docket Item 24, pp. 4–5.

9. The plaintiffs' interrogatory response on this issue was:
*The Right To Due Process Of Law.*
"The Trial Board as constituted, which was convened and conducted its hearing on May 14, 1969, was improperly constituted as to the Plaintiff BOULWARE, in that it was not constituted in accordance with the specific provisions of the only authority for the constitution of such a trial board: Rules and Regulations of the Bureau of Po-

lice, Chapter 7, Section 674. All Plaintiffs were deprived of the right to due process of law by the failure of the Board to have any procedural norms or requirements in the conduct of the hearing. All Plaintiffs were further deprived of the right to due process of law as the members of the Board had advance information as to certain of the facts alleged, had been supplied with copies of certain interview reports previous to the hearing, heard no real evidence to substantiate the charges brought against each Plaintiff, but found each Plaintiff guilty and punished each Plaintiff for misdeeds that none committed and that no evidence was offered to substantiate. Each Plaintiff was deprived of the right to due process of law by the failure to provide the Plaintiffs with any avenue of review of the findings and/or punishments of the Trial Board." Docket Item 24, p. 7.

searches and seizures as guaranteed by the Fourth Amendment. The plaintiffs' Fourth Amendment claims are within the purview of § 1983, see Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L. Ed.2d 492 (1961), and the interception and recordation of telephonic communications can constitute an invasion violative of the Amendment's prohibitions. Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Moreover, even if the defendants' contention that the proceedings at issue were wholly departmental, and therefore civil in nature, the protections against unreasonable searches and seizures do not depend upon the nature of the governmental intrusion. Camara v. Municipal Court of San Francisco, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967) and See v. City of Seattle, 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967).

As has already been discussed, during the weekend of April 14–16, 1969, Chickadel participated in a number of telephone conversations with three of the five plaintiffs regarding his receipt of the subpoena summoning him before the City Solicitor's office. To obtain corroborative statements confirming his accusations, Chickadel recorded eight such conversations with Smith, Shahan and McNair.[10] Although most of the calls were initiated by Chickadel, on at least two occasions one of the plaintiffs called him.

■ Under these facts, the plaintiffs have failed to establish a claim that the defendants have violated their Fourth Amendment rights. The Supreme Court has rejected any argument upon which the plaintiffs could predicate a search and seizure claim. See White v. United States, 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971); Hoffa v. United States, 385 U.S. 293, 87 S.Ct. 408, 17 L. Ed.2d 374 (1966) and Lopez v. United

States, 373 U.S. 427, 83 S.Ct. 138, 10 L. Ed.2d 462 (1963). In Hoffa, the Supreme Court held that an individual who participated in conversations with the defendant under the guise of friendship, but who was actually a government agent did not conduct an illegal search and seizure by listening to the conversations with the intention to transmit the information to police authorities. After analyzing the theory underlying the Fourth Amendment's protections, the Court concluded that the defendant was relying on "his misplaced confidence that [the agent] would not reveal his wrongdoing." 385 U.S. at 302, 87 S.Ct. at 413. Stressing that the defendant had voluntarily made the statements within the agent's hearing or directly to him and that the agent was in the defendant's company with his permission, the Court stated that no rights protected by the Fourth Amendment had been violated.[11] The same factors are applicable to Chickadel's participation in the conversations at issue herein. Each plaintiff was aware of Chickadel's identity and voluntarily made the statements which were subsequently divulged. In each instance, a similar misreliance on Chickadel's intentions resulted in the eventual utilization of the statements for a purpose other than that which they were uttered, however the breach of this reliance does not constitute an infringement of constitutional rights.

A claim that the actual recordation of, rather than the listening to the conversation, comprised a Fourth Amendment deprivation is untenable under the doctrine set forth in Lopez v. United States, supra, and reiterated in White v. United States, supra.

In Lopez, the Court rejected a Fourth Amendment challenge to the use of a tape recording of a conversation between the defendant and an Internal Revenue

---

10. It should be noted that only those plaintiffs whose conversations were taped would have a Fourth Amendment cause of action and then only for the specific calls in which they participated.

11. See also, Lewis v. United States, 385 U.S. 206, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966); and White v. United States, supra.

agent who had taped the conversation.[12] The Court stated:

> Indeed this case involves no "eavesdropping" whatever in any proper sense of that term. The Government did not use an electronic device to listen in on conversations it could not otherwise have heard. Instead, the device was used only to obtain the most reliable evidence possible of a conversation in which the Government's own agent was a participant and which that agent was fully entitled to disclose. And the device was not planted by means of an unlawful physical invasion of petitioner's premises under circumstances which would violate the Fourth Amendment. It was carried in and out by an agent who was there with petitioner's assent, and it neither saw nor heard more than the agent himself. . . .

> Stripped to its essentials, petitioner's argument amounts to saying that he has a constitutional right to rely on possible flaws in the agent's memory, or to challenge the agent's credibility without being beset by corroborating evidence that is not susceptible of impeachment. For no other argument can justify excluding an accurate version of a conversation that the agent could testify to from memory. We think the risk that petitioner took in offering a bribe to Davis fairly included the risk that the offer would be accurately reproduced in court, whether by faultless memory or mechanical recording. 373 U.S. at 439, 83 S.Ct. at 1388 (footnote deleted)

*Lopez* was decided when electronic surveillance was not considered a search and seizure absent a physical penetration of an area in which an individual was afforded Fourth Amendment protection. See Olmstead v. United States, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928) and Silverman v. United States, 365 U.S. 505, 511, 81 S.Ct. 679, 5 L.Ed.

2d 734 (1961). Although the prerequisite that a physical trespass occur to make electronic surveillance a search was expressly overruled in Katz v. United States, supra, the *Lopez* holding was not affected. White v. United States, supra.

In *White,* the Supreme Court was confronted with a problem raised by an evidenced dichotomy between the lower court's reconciliation of the *Katz* and *Hoffa-Lopez* analyses of Fourth Amendment guarantees. The Court faced the issue of whether an agent who overhears a conversation through electronic surveillance devices positioned with the consent of one participant in the conversation can testify concerning the content of the conversation. Holding that such testimony was admissible, the Court cited *Hoffa* as establishing the proposition that the participant could listen and subsequently write down and testify concerning the conversation. It then held that no constitutional distinction results when the participant records the conversation or carries electronic transmitting devices permitting others to monitor the discussions.

> Concededly a police agent who conceals his police connections may write down for official use his conversations with a defendant and testify concerning them, without a warrant authorizing his encounters with the defendant and without otherwise violating the latter's Fourth Amendment rights. Hoffa v. United States, 385 U.S., at 300–303, 87 S.Ct. [408] at 412–414 [17 L.Ed.2d 374]. For constitutional purposes, no different result is required if the agent instead of immediately reporting and transcribing his conversations with defendant, either (1) simultaneously records them with electronic equipment which he is carrying on his person, Lopez v. United States, supra; (2) or carries radio equipment which simultaneously

---

12. See also On Lee v. United States, 343 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1270 (1952) upholding against Fourth Amendment challenge the practice of agents carrying concealed radio transmitters permitting other persons to monitor conversations.

transmits the conversations either to recording equipment located elsewhere or to other agents monitoring the transmitting frequency. On Lee v. United States, supra. If the conduct and revelations of an agent operating without electronic equipment do not invade the defendant's constitutionally justifiable expectations of privacy, neither does a simultaneous recording of the same conversations made by the agent or by others from transmissions received from the agent to whom the defendant is talking and whose trustworthiness the defendant necessarily risks. 401 U.S. at 751, 91 S.Ct. at 1125.

The only distinguishing fact present in this case is the fact that the conversations taped by Chickadel took place on the telephone while those in *Hoffa* and *White* were face-to-face. See Katz v. United States, supra. However, the analysis in *White* evidences that such a distinction is without significance for Fourth Amendment purposes. The electronic surveillance proscribed by *Katz* involves interception of communications by government agents having no consent from either party to the conversation. The factors precluding a Fourth Amendment claim in *Hoffa*, the voluntariness of the statement and the speaker's intent that the individual hear the statements subsequently revealed, are present in these telephone conversations. See Koran v. United States, 408 F.2d 1321 (5th Cir. 1969), cert. denied 402 U.S. 948, 91 S.Ct. 1603, 29 L.Ed.2d 118 (1971), and Holt v. United States, 404 F.2d 914 (10th Cir. 1968), cert. denied 393 U.S. 1086, 89 S.Ct. 872, 21 L.Ed.2d 779 (1969). Thus, under *White* since Chickadel's participation in and consequent listening to the telephone conversations at issue was not violative of the plaintiffs' Fourth Amendment rights, neither was his recordation of the conversations. Having assumed the risk that Chickadel will betray their confidence, the plaintiffs cannot predicate a

Fourth Amendment claim upon the recordation and exposure of their statements. For these reasons, the defendants' motion for summary judgment on the question of the deprivation of the plaintiffs' rights to be free from unreasonable searches and seizures will be granted.

## THE RIGHT TO COUNSEL AND THE RIGHT NOT TO INCRIMINATE ONESELF

The plaintiffs' second claim focuses upon the investigatory phase of the departmental proceedings. Arguing that they were confronted with threats of subsequent criminal prosecution, the plaintiffs assert that throughout the investigation, they were denied their right to counsel and their right not to incriminate themselves.[13] Specifically, the plaintiffs maintain that they were interrogated on April 14 and 17, 1969 and required to submit written reports in the course of the departmental investigation without being informed of their constitutional rights and outside the presence of their counsel or in violation of his advice. In the light of the ultimate result of the departmental investigation and the absence of any criminal proceedings initiated against the plaintiffs, these contentions, predicated upon rights generally associated with criminal prosecutions, are somewhat unusual. None of the statements made nor reports submitted were utilized against the plaintiffs in other than the departmental hearing process. Once again, the failure by the plaintiffs' counsel to cite a single authority supporting recovery or illuminating the specifics of the plaintiffs' legal theory forces the Court to anticipate his contentions.

The essential factor underlying the plaintiffs' position is that the acts of which they were accused and the investigation to which they were subjected were in the nature of criminal proceedings or could have resulted in such proceedings. Thus, they argue that the

13. See footnote 8 for plaintiffs' specific allegations.

constitutional safeguards applicable to criminal prosecutions were requisite for these investigations and that the defendants were constitutionally required to give each plaintiff his *Miranda* warnings and permit him to have counsel present at each stage of these proceedings.

The factual record in this case belies the plaintiffs' sweeping allegations of deprivation of counsel and interrogation without being given *Miranda* warnings. As has been developed previously,[14] prior to the April 14th interrogations, four of the five plaintiffs were informed concerning the nature of the investigation and were given their *Miranda* warnings. Moreover, all four were represented by counsel or specifically waived such representation prior to interrogation. Thus, at least insofar as the April 14th interrogation is concerned, the only plaintiff whose factual allegations coincide with the record is McNair. McNair was asked a number of questions bearing directly on his knowledge regarding the alleged conspiracy against Battaglia prior to receiving his *Miranda* warnings and without the benefit of legal representation.

In addition, all of the plaintiffs evidently claim that their constitutional rights were violated because they were subjected to a second interrogation on April 17, 1969 and were required to file written reports without being reinformed of their constitutional rights and without the assistance of counsel.[15]

■■ The Court is of the opinion that the plaintiffs' contentions in light of the facts of this case fail to establish a § 1983 cause of action. The fundamental shortcoming in plaintiffs' argu-

ment is that the investigations in which they were involved were departmental and therefore, civil in nature, while the rights relied on by the plaintiffs are constitutionally required in criminal proceedings. No criminal prosecutions were commenced as a result of Chickadel's accusations or the defendants' investigation. The entire matter was conducted initially jointly by the City Solicitor's Office and the Department and ultimately within the Department with assistance from the City Solicitor's Office. Thus, whatever the veracity of the plaintiffs' accusations concerning the ulterior motives of the defendants or the role of Battaglia in initiating and pursuing the disciplinary proceedings, at no time was any plaintiff subjected to a criminal arrest or prosecution. It is true that the accusations against the plaintiffs constituted charges upon which criminal prosecutions might have been initiated and criminal liability determined, and the plaintiffs were so informed by the defendants. However, the mere prospect of later criminal prosecution does not preclude the maintenance of civil disciplinary proceedings, nor does it transform them into proceedings in which the Constitution mandates the provision of the full panoply of rights afforded to those actually involved in such criminal investigations and prosecutions. To hold otherwise would prevent agencies such as the police from effectuating internal disciplinary proceedings in any instance where the basis for disciplinary action also involved possible criminal prosecution unless the defendant were granted all constitutional procedures to which he would be entitled in such a criminal action.[16]

---

14. See footnotes 2 and 3 and accompanying text.

15. The contents of the reports submitted and the nature of the 17th interrogation have been discussed previously. At these interrogations, White and Sylwestrzuk made no effort to question the men after their request for counsel or request not to comment.

16. The Court is, of course, not confronted with either an attempt to utilize statements obtained in such disciplinary proceedings in a criminal prosecution, or a civil suit seeking damages for such utilization. The necessity to provide counsel and to inform individuals of their constitutional rights to render statements admissible or to preclude civil liability for their use in criminal prosecutions is expressly not decided by this Court.

The right to counsel under the Sixth Amendment and the right to be informed regarding one's constitutional rights under the Fifth Amendment are ordinarily discussed and developed in the context of criminal prosecutions. Thus, the issues confronted are generally the admissibility of statements obtained in custodial interrogation, Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L. Ed.2d 694 (1966) or the constitutionality of convictions resulting from the deprivation of legal representation at a critical stage of the prosecution. Coleman v. Alabama, 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970) (preliminary hearing); United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) (line-up); and Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964) (custodial interrogation). The question of civil liability for deprivations of these rights is not frequently discussed. In the context of criminal prosecutions, these rights are mandatory and the deprivation of one of them precludes either utilization of the tainted statements or affirmation of the uncounseled conviction. However, while those rights are mandatory in the above discussed sense, it does not follow that they are mandatory in an administrative proceeding concerning matters which might precipitate subsequent criminal prosecutions, or that the failure to provide them in such a civil proceedings constitutes a deprivation of a constitutional right upon which civil liability may be predicated. It is possible that the failure to adequately advise someone of his constitutional rights or to provide legal representation in a departmental proceedings such as this one might effect a subsequent criminal prosecution, however these failures within the civil context do not constitute constitutional deprivations.

■ That the Fifth Amendment privilege against self-incrimination extends to persons in civil or administrative procedures is clearly established. See Garrity v. New Jersey, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967);

Spevack v. Klein, 385 U.S. 511, 87 S.Ct. 625, 17 L.Ed.2d 574 (1967); and Albertson v. SACB, 382 U.S. 70, 86 S.Ct. 194, 15 L.Ed.2d 165 (1965). However, there is no obligation to inform an individual of his Miranda warnings in every instance in which he would be entitled to exercise his Fifth Amendment rights. United States v. Jaskiewicz, 433 F.2d 415 (3rd Cir. 1970) cert. denied, 400 U. S. 104, 91 S.Ct. 582, 27 L.Ed.2d 632 (1971) and United States v. White, 417 F.2d 89 (2nd Cir. 1969) cert. denied 397 U.S. 912, 90 S.Ct. 910, 25 L.Ed.2d 92 (1970). The requirement to inform an individual arises only after he has been taken into custody in a criminal proceeding. Id. Thus, since the plaintiffs were subject to a civil investigation and had not been taken into custody, the defendants were not under an affirmative obligation to advise the plaintiffs of their Miranda warnings. See United States v. Prudden, 424 F.2d 1021, 1028 (5th Cir. 1970). Possibly, in light of the fact that the plaintiffs were subject to subpoenas and questioning by their superiors, the Miranda warnings may have been necessary to assure the admissibility of any statements made during interrogation in a prospective criminal prosecution. However, as the Third Circuit Court stated in the Jaskiewicz case, the constitutional standard governing admissibility in this situation is the voluntariness of the statements and not the presentation of the Miranda warnings. 433 F.2d at 420.

■ In addition, even assuming that the plaintiffs were "in custody" so that informing them of the Miranda warnings was a prerequisite to the admissibility of any statement made during the interrogation, there is a further flaw in the plaintiffs' effort to utilize the Miranda doctrine in an attempt to recover civil damages. This defect arises from what this Court considers is an erroneous reliance on the primary function and concern of Miranda, and the procedural safeguards adopted therein. The plaintiffs seek to predicate civil liability upon the defendants' failure to advise

them of their constitutional rights regardless of their knowledge or awareness of the existence and scope of these rights. To insure that custodial interrogation occurred in non-coercive circumstances and that individuals so questioned were apprised of their constitutional rights, *Miranda* established procedural safeguards. Appropriate warnings prior to custodial questioning are prerequisite to admission of any statements made therein regardless of the knowledge or experience of the individual being questioned. However, while *Miranda* prescribed a particular procedural plan, the continued constitutional concern of the Court was the nature of the statements elicited during custodial interrogation and the knowledge of the person subject thereto. The procedure adopted was applicable to all cases presumably to standardize police practice and eliminate judicial hearings on an individual's legal understandings. This Court, however, cannot accept the contention that the *Miranda* rationale supports the proposition that the failure to advise an individual of his constitutional rights creates civil liability when he is already aware of those rights.

None of the plaintiffs, all of whom are experienced police officers, has alleged or argued that he was unaware of his constitutional rights, and with the exception of McNair, each was advised of his rights at the outset of the initial interrogation. Although not informed of his rights until after a brief period of questioning, McNair has been shown to have been knowledgeable regarding them[17] In this case, no constitutional rights have been violated, since the individuals were already aware of the protections the warnings are designed to reveal.

The Sixth Amendment's guarantee of a right to counsel has not been extended to civil proceedings. United States v. Sturgis, 342 F.2d 328 (3rd Cir. 1965); Grabinger v. Conlisk, 320 F.Supp. 1213 (N.D.Ill.1970); Cassidy v. Hood, 304 F.Supp. 864 (E.D.Mo.1969); and Barker v. Hardway, 283 F.Supp. 228 (S.D.W.Va.1968). Whatever the ultimate resolution of the plaintiffs' right to counsel during these interrogations had criminal prosecutions been commenced, see Kirby v. State of Illinois, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972), the fact that the interrogations took place in the absence of counsel and were utilized in an intra-departmental investigation does not infringe any constitutional right or create any civil liability.

The conclusion that no constitutional rights have been violated through the administrative investigation is supported on two grounds. First, it affords administrative organizations responsible for law enforcement an opportunity to implement internal disciplinary procedures without necessarily providing the accused with all rights requisite in criminal prosecutions. Second, through the use of appropriate exclusionary tools in a subsequent criminal proceeding, it ade-

17. In a telephone call between Chickadel and McNair which occurred on the weekend preceding the April 14th interrogation, McNair demonstrated not only a general awareness of his rights, but also expressed a specific opinion regarding their applicability to the scheduled questioning.

McNair: Are you going to take somebody with you, tomorrow—for Monday?

Chickadel: Ah—I was talking to Symthe. See, I'm gonna to see him about that

McNair: You know who would be a nice person to take?

Chickadel: Who.

McNair: Conte.

Chickadel: I don't know.

McNair: Because, remember Conte says, anytime, no charge?

Chickadel: See? I ain't got nothing to hide, . . . .

McNair: Nah, that's not—that's not the point. I mean, if—if this co—if its about the race track fine. You know? No, sweat, no pain.

Chickadel: Un-huh.

McNair: *But if he starts injecting this other stuff, pull out the Miranda Decision right down on him.* . . .

Docket Item 45, Appendix J. p. 3. (emphasis added)

quately safeguards the individual's constitutional guarantees in such actions.

For the above stated reasons, the defendants' motion for summary judgment on the issues of right to counsel and the right to be informed of Fifth Amendment rights is granted.[18]

## DUE PROCESS OF LAW

The plaintiffs' primary argument, and the basis for their prayer for reinstatement and restoration of benefits, is their contention that the adjudicatory phase of the departmental proceedings was conducted in a manner which denied them due process of law. Throughout their responses to interrogatories and in their answering brief opposing the entry of summary judgment, the plaintiffs have raised numerous objections to the constitutional adequacies of the hearing procedure. Their response to the defendants' request for elaboration upon their due process claim [19] enumerated the following alleged insufficiencies: 1. As to Boulware, the Trial Board was improperly constituted under the Department's rules and regulations; 2. the Trial Board had no procedural requirements for conducting a hearing; 3. the members of the Trial Board had advance information regarding the matter; 4. no substantive evidence was offered to support the plaintiffs' convictions; and 5. there was no avenue for review. In their brief, plaintiffs specified several additional factors: 6. There was no burden of proof upon the prosecution; 7. the Trial Board members considered matters outside the record; 8. the Trial Board members adversely considered the plaintiffs' exercise of their constitutional rights; and 9. the defendants had ulterior motives in bringing these charges against the plaintiffs. Characterizing the plaintiffs' claims as predicated solely upon procedural due process grounds, the defendants argue that the notice and hearing actually afforded to the plaintiffs more than satisfied constitutional requirements.

While the plaintiffs' allegation that they were convicted without substantive evidence raises what appears to be a substantive due process claim, most of the above listed factors constitute a challenge to the sufficiency of the procedures actually afforded to the plaintiffs in the adjudicatory hearing and review process. Procedural due process does not embody rigid or inflexible standards, Cafeteria & Restaurant Workers Union v. McElroy, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961), and the precise parameters mandatory in each particular instance require the balancing of the competing interests of the governmental entity and the individual. Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L. Ed.2d 287 (1970); Grausam v. Murphey, 448 F.2d 197 (3rd Cir. 1971); and Drown v. Portsmouth School District, 435 F.2d 1182 (1st Cir. 1970), cert. denied 402 U.S. 972, 91 S.Ct. 1659, 29 L.Ed.2d 137 (1971). Although the plaintiffs have focused on specific alleged inadequacies, the concept of due process mandates an examination of the totality of the procedures afforded rather than the absence or presence of particularized factors.

To reiterate briefly, the defendants provided notice of the hearing and specifically detailed the charges against each plaintiff; in each case the Department proceeded initially against the respective plaintiff; the plaintiffs were represented by counsel, who was afforded the opportunity to cross-examine each prosecution witness; and the plaintiffs were permitted to present evidence in their own behalf. In addition, the plaintiffs' counsel was allowed certain latitude in the scope of his examination and in registering any objections to procedures utilized or evidence submitted. Finally, the findings and recommendations of the Trial Board were reviewed

---

18. The plaintiffs' allegations that their privilege against self incrimination was infringed because the Trial Board relied on their silence in the face of accusations in finding them guilty of the departmental charges preferred will be discussed in the succeeding section.

19. See footnote 9.

and adopted by Chief McCool and Commissioner O'Rourke.

■ The Court is of the opinion that absent some particular factor of such import as to deny to the plaintiffs an effective opportunity to participate in and defend themselves in the hearings, the procedures utilized were sufficient to fulfill constitutional requirements. The plaintiffs' initial complaint involves the composition of the Trial Board as to Boulware's hearing. They argue that the Trial Board was improperly convened as to him under the Departmental Rules and Regulations' rules dealing with Trial Boards. At the date of the hearing, the pertinent rule read "In such cases involving charges against an officer above the rank of Sergeant the Trial Board shall be composed of the Commissioner of Public Safety or a majority." Adopted at a time when Wilmington had a Board of Directors, the rule was, at best, ambiguous in meaning and was not amended when the Department altered its structure. The plaintiffs argue that under this rule the Commissioner of Public Safety was the only person eligible to sit on the Trial Board and that he was disqualified for prior knowledge regarding the case. Having argued that Boulware was constitutionally entitled to a hearing, the plaintiffs nonetheless contend that the defendants had no authority to convene a Trial Board to hear his case. This position is patently untenable. First, McCool has testified that the rule was interpreted to require a majority of staff officers, officers with the rank of Captain or above. As a legitimate construction of a Department rule, this interpretation will not be overturned by a Federal court. Second, in the absence of an appropriate rule there is no federal constitutional prohibition to implementation of procedures designed to comply with due process dictates. See Ferguson v. Thomas, 430 F.2d 852, 856 (5th Cir. 1970). Any claim Boulware might have concerning the composition of the Trial Board under Department Rules does not raise to constitutional stature and should have been presented to the appropriate State Court.

■ The plaintiffs' claims that the Trial Board had no procedural norms, that it had no concept of burden of proof, and that it decided on matters outside the record, are without merit. The Trial Board adhered to the Department's Rules governing such hearings and afforded the plaintiffs an orderly opportunity to hear evidence against themselves and present a defense. Moreover, each member was convinced of the plaintiffs' guilt from the evidence elicited at the hearing. (Depositions: Turner, p. 22; Bozman, pp. 28 and 39; and Shockley, pp. 13 and 22). An examination of the transcript of the hearings and the three officers' depositions clearly indicates that each made every effort to accommodate the defendants' procedural requests and that each was convinced of their guilt. The Federal Constitution does not command specific due process procedures, nor does it impose precise trial type requirements on state administrative disciplinary proceedings.

■ The remaining four alleged procedural irregularities raise more substantive challenges. However, the plaintiffs' assertions are not supported on the record. First, they claim the members of the Trial Board had prior knowledge of the cases. In fact, each member was provided with a record of the departmental investigation shortly before the hearings. Provision of such transcripts was standard procedure for departmental hearings (Bozman Dep. p. 43), and assisted the Trial Board members to conduct necessary interrogations. The files are undoubtedly especially useful in those cases where neither side was represented by counsel as is often the case in departmental hearings. Since due process requires a balancing of competing interests after an evaluation of the entire proceedings, this Court cannot say as a matter of law that the brief introduction to the Departmental case and investigatory activities which the Trial Board members gain through access to these files is sufficient to offset their

value in assisting the Trial Board in conducting a meaningful inquiry into the area of alleged wrongdoing. (Bozman Dep. p. 43). Such a ruling might seriously constrain the efficacy of these departmental tribunals. Finally, certain statements by the plaintiffs suggest that the Trial Board had prior knowledge of their cases because of rumors circulating throughout the Department.[20] This Court cannot seriously consider a contention that such "knowledge" might disqualify a member of the Department. To hold otherwise is, most likely, to preclude any acceptable tribunal in a Department such as Wilmington's. McCool testified he selected the three men with least knowledge of the matters at issue, and his testimony is uncontradicted.

▬ The plaintiffs' objection to the review procedure, and McCool and O'Rourke's prior knowledge of their cases does not establish a due process constitutional infirmity. The men were afforded hearings before three officers having no information regarding their cases, and constitutional due process does not mandate an additional review process. Certainly in a controversial case such as this one, the Commissioner and Chief of Police are going to be involved at the initiation of the matter. While this might prejudice the plaintiffs because their superiors are more intimately aware of the evidence supporting their guilt, it neither negates the Trial Board hearing and findings issued thereunder, nor deprives these plaintiffs of their constitutional protections.

▬ The plaintiffs assert that in reaching their conclusion on the plaintiffs' guilt, the Trial Board members considered the plaintiffs' refusals to answer Chickadel's allegations and to take polygraph tests. This allegedly placed an unconstitutional burden on their Fifth Amendment privilege against self-incrimination and, presumably, their right to procedural due process. Since

the plaintiffs' objections to submitting to polygraph tests were predicated upon the position that the results were unreliable, it is difficult to construe the Trial Board members' consideration of this factor as violative of Fifth Amendment rights. However, this Court perceives a more fundamental weakness in the plaintiffs' position. Through detailed interrogation of the Trial Board members during their depositions, the plaintiffs were able to ascertain that in their deliberations two of the Captains took into consideration some or all of the plaintiffs' refusals, on advice of counsel, to participate in the departmental investigation. While the depositions make clear that such considerations played a minimal role in the ultimate finding of guilt, the plaintiffs, nonetheless, stress these alleged infringements on their exercise of Fifth Amendment privileges and seek to void the entire hearing procedure. Placed on the Trial Board because of their experience as police officers, these defendants are not trained legal experts and must receive and analyze evidence as administrative experts with the responsibility to evaluate that evidence with the expertise they bring to the Trial Board. Such dissection of administrative disciplinary proceedings and tribunal decisional processes cannot be sufficient to nullify an otherwise constitutionally sufficient procedure.

▬ The consideration of an individual's refusal to participate in departmental hearings such as these does not constitute an impermissible burden upon the exercise of one's Fifth Amendment rights. See Uniformed Sanitation Men Assn., Inc. v. Commissioner of Sanitation, 392 U.S. 280, 88 S.Ct. 1917, 20 L. Ed.2d 1089 (1968), and Gardner v. Broderick, 392 U.S. 273, 88 S.Ct. 1913, 20 L.Ed.2d 1082 (1968). Although the Supreme Court has held that a governmental entity cannot utilize the threat of dismissal to obtain a waiver of Fifth Amendment privileges, Garrity v. New

20. Although Bozman requested information before the hearing to prepare himself for questioning, Chief McCool expressly refused to comply with this request to avoid prejudicing his opinion. Bozman Dep. pp. 28, 42–43.

Jersey, supra; nor dismiss an employee for the failure to waive such rights, Gardner v. Broderick, supra, it has held that the dismissal of a public employee, who has not been required to waive Fifth Amendment rights, for refusing to answer questions relating to the performance of his official duties is not violative of nor place an impermissible burden upon that individual's exercise of his privilege against self-incrimination. Gardner v. Broderick, supra, and Uniformed Sanitation Men Assn., Inc. v. Commissioner of Sanitation, supra. The holding preserves the individual's constitutional protection in the criminal process while permitting administrative agencies the opportunity to maintain internal discipline. This Court cannot distinguish for constitutional purpose between the direct dismissal for the failure to answer questions sanctioned in *Gardner* and the Trial Board's consideration of such refusal in reaching its decision adverse to the plaintiffs in the case at suit.

The plaintiffs' final procedural due process issue is premised upon the defendants' alleged ulterior motives in initiating the disciplinary actions. Certainly, one prerequisite of a due process hearing is that the members of the Trial Board and presumably the persons bringing the charges and selecting the Board are impartial. Although several of the plaintiffs have suggested possible hypotheses supporting their contention that the defendants conspired against them, they have not presented any facts, with the exception of their repeated denials of guilt, which support this claim. Among the speculations raised are the allegations that Chickadel was mentally ill or that Battaglia "had something on him", that Battaglia was out to eliminate these members of the Vice Squad to prevent an investigation of a relative, and that the other members of the department were hoping for promotions. However, in each instance the plaintiffs sought to develop facts to support this theory, the defendants adequately explained the circumstances.[21] Thus, while it is clear that the plaintiffs' counsel maintains such a conspiracy existed against his clients,[22] his clients have neither adequately articulated their conclusions regarding such a conspiracy nor facts they have supporting their theories.

Other Federal Courts have sanctioned procedures providing substantially fewer protections or privileges by rejecting similar due process challenges in situations involving internal Police Department disciplinary matters. Grabinger v. Conslick, supra, and Allen v. City of Greensboro, 322 F.Supp. 873 (M.D.N.C. 1971). Moreover, in a related area which has been the subject of substantial recent litigation, the procedural due process rights of school teachers prior to dismissal, no court has required a more stringent set of procedures than those provided to these plaintiffs.[23]

The plaintiffs' assertion that they were found guilty by a Trial Board which heard no evidence against them is meritless. The transcript of the Trial Board hearing clearly evinces sufficient facts to support a conviction. Having heard Chickadel's statements unequivocally detailing the involvement or knowledge of all five plaintiffs, tape record-

21. See for example—O'Rourke Dep. pp. 35–37, and McCool Dep. pp. 35–37—on the question of removing the Vice Squad for surveillance of vice activity and O'Rourke pp. 25–28 and 46–49 on rapid promotions of numerous defendants.

22. See Docket Item 64—Oral argument by Conte, p. 40. This type statement is exemplary of the difficulties arising from having an attorney who is alleged to have been involved in the factual occurrences underlying the initial disciplinary actions.

Since Conte has not presented any testimony, his personal remarks do not constitute part of the factual record.

23. For examples of three of the most demanding sets of requirements see: Roth v. Bd. of Regents, 310 F.Supp. 972 (W. D.Wis.1970), affirmed 446 F.2d 806 (7th Cir. 1971); Orr v. Trinter, 318 F.Supp. 1041 (S.D.Ohio 1970) reversed 444 F.2d 128 (6th Cir. 1971); and Ferguson v. Thomas, supra.

ings of Smith, Shahan and McNair in which they apparently evidenced their own participation in or awareness of the plan, and White's testimony concerning McNair's statements implicating Shahan, the Trial Board did not act arbitrarily or unreasonably in concluding that the plaintiffs were guilty.

### CONCLUSION

This Court is well aware of its own admonition to vigorously guarantee the protection of Federal Constitutional rights. See Hayes v. Cape Henlopen School District, 341 F.Supp. 823, (1972). However, after careful examination of the undisputed portions of the factual record,[24] it is evident that the defendants have violated none of the plaintiffs' constitutional rights. Therefore, the plaintiffs will not be able to establish a claim under 42 U.S.C. § 1983, and a summary judgment must be entered for all defendants.

Submit order.

---

24. The plaintiff has argued that he has additional discovery including specifically a re-transcription of the telephone calls. In the two months since this motion was argued, the plaintiffs have submitted no additional evidence. Plaintiffs' counsel agrees to the summary judgment schedule and has proffered no indication of what additional evidence he wishes to elicit. In such circumstances, his representations will not preclude the entry of judgment.