Raymond D. WOMER, Plaintiff-
Appellant,

v.

Robert HAMPTON et al., Defendants-
Appellees.

No. 73–1494.

United States Court of Appeals,
Fifth Circuit.

June 17, 1974.

Rehearing Denied July 12, 1974.

Sam O. Buckley, New Orleans, La., for plaintiff-appellant.

Gerald J. Gallinghouse, U. S. Atty., Michaelle F. Pitard, Mary Williams Cazalas, Asst. U. S. Attys., New Orleans, La., for defendants-appellees.

Before RIVES, WISDOM and MORGAN, Circuit Judges.

RIVES, Circuit Judge:

Raymond D. Womer, Jr. brought suit in the district court under 5 U.S.C. § 701 et seq., and 5 U.S.C. § 7512 against the United States and the members of the U.S. Civil Service Commission for wrongful removal from his civilian job with the Department of the Army. Womer sought a judgment setting aside his removal and reinstating him to his position with full rights from the date of removal. The district court granted summary judgment to the defendants-appellees. We affirm.

I.

Womer was employed by the United States Army Corps of Engineers in the position of Supervisory Construction Representative, GS–10. On November 10, 1969, the Army Engineer District in New Orleans conducted an administrative inquiry to which Womer was summoned. In addition to Womer, six agency officials were present at the inquiry. The presiding official opened the proceedings by announcing:

"Mr. Womer, good morning. This is an administrative hearing that we have here this morning, and the purpose of this hearing is strictly an administrative inquiry that we care to make at this time. We are interested in looking into certain allegations of impropriety and certain allegations of irregularities which would have oc-curred or are alleged to have occurred in the New Orleans Area Office. These allegations go back several years and certain of these allegations of impropriety and irregularities concern you. So, the purpose of bringing you in here is to give you an opportunity to talk to the members of the group here—I believe you know all of them—and to explain your position fully to them as you may care to do."

(P. 1, Proceedings of November 20, 1969.) The presiding official then informed Womer that the irregularities which had been alleged were serious enough to warrant the dismissal of a government employee, "specifically serious enough to warrant your dismissal." Womer was further told that it was alleged that he had been performing work for pay for government contractors on contracts which were under his supervision as the Supervisory Inspector for the New Orleans Area Office. When asked if he understood what had been said, Womer replied, "Yes, sir." The presiding official then asked, "Would you care to make any comment in that regards?" Womer replied, "I don't know what you're talking about." In response to two further questions, Womer denied working for any government contractors, and denied receiving payment for any such work.

The presiding official at this point showed Womer photostatic copies of three checks in the amounts of $1225, $1275, and $300. Each of these checks was made out to Womer by a government contractor, and endorsed by Womer or his wife. Womer said, "Can I explain?" In over seventy pages of transcribed conversation, Womer explained the circumstances whereby he received these checks, and responded to questions put to him by members of the panel. Briefly, Womer said that the checks for $1225 and $1275 were repayment of his investment in a partnership named Wallco. Womer stated that the name Wallco "represents Womer, [James] Arnoult, [C.C.] Louque, and [General Russell]

LeBlanc." [1] (Rec. of Proc. 4.) "We drew up a company with the purpose of forming a concrete company, concrete batching company, more or less a portable company, to put material on the batture where the various different concrete slope paving jobs would be along the river, and we each put in a total of $2,500." (R. 3–4). Womer claimed that the $300 check represented payment for some work his son-in-law had performed for Arnoult and Louque Construction Company. In response to a question from the presiding officer later in the proceeding, Womer denied ever asking an employee to falsify a daily log to show that he was present at a site on a day that he had not been there.

Under questioning, Womer admitted that he was aware of one instance in which Wallco had supplied concrete to a government job under his supervision. One official asked, "At that point, didn't you realize that you were, in effect, double-dealing?" Womer replied, "Yes, sir." (Rec. 56.) Womer also admitted that after he became involved in Wallco, his partners in Wallco, who were engaged in other government contract work through Arnoult and Louque Construction Company, "began to cut corners," because "they figured they had me over a barrel." (Rec. 31.) Although Womer insisted that he did not feel obligated to them, he conceded that he felt they had a weapon over him. (Rec. 31.) Soon after this concession, the following exchange occurred with regard to Womer's interest in Wallco:

"COL. ELDER [Agency official]: Well, didn't you feel this was kind of an unusual position for you to have to be in as a Government inspector?

"MR. WOMER: Yes, sir, I did.

"COL. ELDER: Yet, you still did not bring this to anybody's attention?

"MR. WOMER: No, sir, because I feared I would be right where I am today.

"MR. TOWERS [Agency official]: In other words, you knew you were violating the standards.

"MR. WOMER: Back in 1962 or 63, there wasn't as much emphasis—there may have been a regulation, I don't know—but I didn't pay too much particular attention to the regulation.

"MR. TOWERS: But you signed a certificate back in 62 saying that you had paid attention to it and you were abiding by the regulations and the standards of conduct.

"MR. WOMER: In all probabilities, I did, Mr. Towers. I don't deny knowing I did wrong. I felt guilty about it, now more than anything else, not just today—the last 3 or 4 years that I have been having my problems with this individual contractor, that dealing with contractors, doing work for contractors, or any phase like that is taboo and I haven't done any of it since this particular . . . ."

(Rec. 32–33.)

By letter dated December 2, 1969, the Deputy District Engineer advised Womer that he proposed to effect Womer's removal from employment because of deviations from ethical standards of conduct. This letter detailed three charges in support of removal: (1) Womer had participated as a partner in a concrete company, and this constituted a serious conflict of interest and a violation of Army Regulation 600–50; (2) Womer had submitted a fraudulent travel voucher; and (3) Womer had performed services for a contractor at the same time and on the same job he was inspecting, in violation of sections 1.3 and 1.12 of AR 600–50.

Womer replied on December 4 to the notice of proposed adverse action. He conceded that he had entered into a partnership known as Wallco, but insisted that he gave no special consideration

1. At some point, LeBlanc apparently backed out. According to Womer, LeBlanc never put any money into the enterprise. (R. 13.)

to Wallco or to his partners in their other government contract work. He denied that he had falsified a travel voucher or that he had personally done any work for a government contractor.

On December 29, 1969, the District Engineer notified Womer that he found that the charges in the December 2 letter were supported by the evidence and warranted Womer's removal to promote the efficiency of the service. Womer was removed effective January 6, 1970.

Womer appealed to the Civil Service Commission. On May 14, 1970, an Appeals Examiner from the Dallas Regional Board found that the charges of conflict of interest, through participation in Wallco and through either performing or arranging to have performed work for a government contractor, were sufficient to warrant removal in the interest of the efficiency of the service. The Examiner found that there was insufficient evidence to support the charge that Womer had submitted a fraudulent travel voucher. On August 18, 1970, the Board of Appeals and Review of the Civil Service Commission affirmed the Examiner's decision.

On this appeal, Womer's primary contentions concern the November 20 proceeding. Womer claims that he did not receive adequate prior notice of this administrative proceeding and of the allegations against him. He further claims that he was not fully advised of his options and of the consequences of his choice at the beginning of the proceeding. Because of these alleged procedural defects, Womer contends that the statements made by him at the proceeding may not be used as evidence to support his removal from his job.[2] Womer contends that if his statements of November 20, and their fruits, are suppressed,

there is insufficient evidence to support removal from his job.

## II.

We first examine whether Womer was entitled to prior notice of the November 20 proceeding. So far as we can determine, there are no specific statutory or administrative rules prescribing the procedures for a proceeding of the sort conducted on November 20. In the absence of any governing statutes or regulations, we turn immediately to the constitutional question of whether the failure to give Womer advance notice of the proceeding violated procedural due process.

Hannah v. Larche, 1960, 363 U.S. 420, 442, 80 S.Ct. 1502, 1514, 4 L.Ed.2d 1307, provides some general guidelines as to the requirements of due process in administrative proceedings:

" 'Due process' is an elusive concept. Its exact boundaries are undefinable, and its content varies according to specific factual contexts. Thus, when governmental agencies adjudicate or make binding determinations which directly affect the legal rights of individuals, it is imperative that those agencies use the procedures which have traditionally been associated with the judicial process. On the other hand, when governmental action does not partake of an adjudication, as for example, when a general factfinding investigation is being conducted, it is not necessary that the full panoply of judicial procedures be used. Therefore, as a generalization, it can be said that due process embodies the differing rules of fair play, which through the years, have become associated with differing types of proceedings. Whether the Constitution requires that a particular right obtain in a specific proceeding depends upon

---

2. The opinion of the Appeals Examiner from the Dallas Regional Board reveals that in the proceedings before the Regional Board, Womer objected "to the procedures employed by the U.S. Army Engineers District in developing the case against him; specifically alleging that his rights were violated in

the administrative hearing held on November 20, 1969." Womer also raised this claim in the district court. Thus, it is clear that Womer has been diligent in preserving his claim that the November 20 proceeding violated his constitutional rights.

a complexity of factors. The nature of the alleged right involved, the nature of the proceeding, and the possible burden on that proceeding, are all considerations which must be taken into account . . . ."

Following the mode of analysis suggested in Hannah v. Larche, we consider the nature of the alleged right. Womer claims a right to advance notice of a proceeding affecting his retention of his job. A majority of the Supreme Court has indicated that a claim of entitlement to a government job in the competitive Civil Services is a property interest requiring the protections of procedural due process.[3] The November 20 proceeding related to and affected the question of whether Womer should be removed from his job as a supervisory inspector. In fact, as Womer suggests, the issue of whether he should be removed from his job was practically resolved by his comments and answers to questions on November 20, for his statements about Wallco constituted an admission of conduct sufficient to justify removal. Womer argues that the panel which interviewed him on November 20 knew or should have known that the proceeding would determine, or have a substantial impact upon, his retention of his job. He urges that due process required the panel to give him advance notice of the proceeding and of the allegations against him.

Adequate notice is essential to due process in many administrative and judicial proceedings. For example, before welfare benefits may be terminated, a recipient must be provided "timely and adequate notice detailing the reasons for a proposed termination." Goldberg v. Kelly, 1970, 397 U.S. 254, 267–268, 90 S.Ct. 1011, 1020, 25 L.Ed.2d 287. A student at a tax-supported college is entitled to notice and a hearing before expulsion. "The notice should contain a statement of the specific charges and ground which, if proven, would justify expulsion under the regulations of the Board of Education." Dixon v. Alabama State Board of Education, 5 Cir. 1961, 294 F.2d 150, cert. den. 1961, 368 U.S. 930, 82 S.Ct. 368, 7 L.Ed.2d 193. Notice is required by statute for many administrative proceedings.[4] An individual accused of a crime must be given reasonable notice of the specific charges against him.[5] More generally, in a civil case, the Supreme Court has stated that "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." Covey v. Town of Somers, 1956, 351 U.S. 141, 146, 76 S.Ct. 724, 727, 100 L.Ed. 1021, quoting Mullane v. Central Hanover Trust Co., 1950,

---

3. Arnett v. Kennedy, 1974, —— U.S. ——, 94 S.Ct. 1633, 40 L.Ed.2d 15 [42 USLW 4513, Apr. 16, 1974] at 4523 (dissenting opinion of Marshall, J., joined by Douglas and Brennan, JJ.), 4530 (concurring and dissenting opinion of Powell, J., joined by Blackmun, J.) and 4536 (concurring and dissenting opinion of White, J.).

4. 5 U.S.C. § 554(b):
   "(b) Persons entitled to notice of an agency hearing shall be timely informed of—
   "(1) the time, place, and nature of the hearing;
   "(2) the legal authority and jurisdiction under which the hearing is to be held; and
   "(3) the matters of fact and law asserted.

When private persons are the moving parties, other parties to the proceeding shall give prompt notice of issues controverted in fact or law; and in other instances agencies may by rule require responsive pleading. In fixing the time and place for hearings, due regard shall be had for the convenience and necessity of the parties, or their representatives."

5. Frisbie v. Collins, 1952, 342 U.S. 519, 522, 72 S.Ct. 509, 96 L.Ed. 541; Williams v. People of State of N.Y., 1949, 337 U.S. 241, 245, 69 S.Ct. 1079, 93 L.Ed. 1337; Cole v. State of Arkansas, 1948, 333 U.S. 196, 201, 68 S.Ct. 514, 92 L.Ed. 644; In re Oliver, 1948, 333 U.S. 257, 273, 68 S.Ct. 499, 92 L.Ed. 682; McCarly v. Sanders, M.D.Ala.1970 (three-judge court), 309 F.Supp. 8, 11.

339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865. As indicated by *Covey*, the primary purposes of notice are to alert affected parties of the pendency of the action, and to give them an opportunity to prepare and present their arguments to the court or administrative body which will adjudicate the matter.

We next examine the nature of the November 20 proceeding. There were allegations of continuing wrongdoing on the part of an employee of the Corps of Engineers. These allegations merited immediate investigation. In fact, the Corps of Engineers would have been remiss not to have investigated charges that an employee was accepting payments for work on contracts which the employee was supervising. A government agency must maintain high standards of integrity among its employees. Conflicts of interest cannot be allowed or condoned. Equally important, in this case there existed the possibility of danger to the public health and welfare. Womer was an inspector of construction projects related to flood control. It was alleged that he had received money from government contractors. If true, these allegations would put in doubt not only the reliability of Womer's past reports, but also his willingness or ability to supervise current projects.

At the beginning of the November 20 proceeding, the presiding official announced that the hearing was "strictly an administrative inquiry." In its brief, the government argues that the proceeding was an "informal investigatory hearing," "a full informal discussion." Womer was not asked to testify under oath, and no technical rules of evidence or procedure were followed. At the same time, there were some aspects of the proceeding which appear more elaborate than an "informal discussion." For example, there were six officials present; there was a "presiding" official; the presiding official was an attorney; and a recorder took down everything that was said. The government explains that Womer's supervisor did not conduct the interview because this

supervisor was also under investigation. The government also emphasizes that the proceeding was not designed to determine whether Womer should be removed from his job, and that the question of removal was not determined at this proceeding.

Shortly after the proceeding began, the presiding official showed Womer copies of three checks made out to Womer by a government contractor, and apparently endorsed either by Womer or by his wife. When shown these checks, Womer asked if he might explain the circumstances surrounding their issuance. No doubt a primary purpose of the hearing was to confront Womer with these checks and to see what he would say. It is somewhat difficult to think of an entirely innocent explanation for these checks. However, if Womer had claimed that he had never seen the checks, or if he had given some plausible innocent explanation for them, and if his story had been thought true, the agency could have avoided the necessity of temporarily relieving him of his job, or of issuing formal charges against him.

Finally, we examine the possible burdens which advance notice and other due process requirements might place upon investigatory proceedings of the sort involved in this case. One problem would involve agency efficiency. It would be cumbersome and impractical to require formal notice each time a supervisor wished to question an employee about a job-related matter which might affect job retention. Efficient operation of a government agency would prove difficult under a system where employer-employee relations were formalized to such an extent. Supervisors must be able to question employees freely about work-related matters. It is true that the present case goes somewhat beyond routine informal questioning.

A second problem might involve time. Adequate notice in part implies sufficient time to prepare for a proceeding. Where serious charges about work-related matters arise, an agency should in-

vestigate promptly. If dishonesty exists within an agency, the agency should act immediately. An agency's desire to act quickly, and its need to act quickly in matters involving the public health and welfare, may conflict with the idea of advance notice. An alternative to immediate investigation might be temporary suspension of employees suspected of wrongdoing, and a later investigation. However, such a procedure might stigmatize innocent employees in those cases where the charges prove unfounded. The procedure utilized in the present case gave the employee an opportunity to respond to serious charges before the agency initiated adverse action.

Another problem relates to employee candor. An employee would more likely answer honestly and frankly if he were suddenly confronted with evidence of an apparent wrongdoing. This consideration would have particular force where an employee was suspected of dishonesty. In such a case, an agency might fear that prior notice would allow too much opportunity for the employee to frame an artful but dishonest explanation. In a case where the evidence of wrongdoing and the alleged wrongdoing itself are easily understandable, there is relatively little danger that sudden confrontation will produce such confusion that the employee will be unable to give a coherent explanation of his conduct.[6]

After consideration of the factors discussed, we conclude that due process does not require advance notice before federal supervisory officials may confront a government employee in the competitive Civil Service with allegations of job-related improprieties.[7]

Fewer procedural safeguards are required by the due process clause in hearings which are investigatory rather than adjudicatory or accusatory. In Hannah v. Larche, *supra,* the Court held that persons whose conduct is under investigation by the United States Commission on Civil Rights are not entitled to such rights as apprisal, confrontation, and cross-examination, in light of the "purely investigative" nature of the Commission's proceedings, the burden such rights would place on those procedures, and the traditional procedure of investigating agencies in general. The Court noted that ". . . the Commission does not and cannot take any affirmative action which will affect an individual's legal rights. The only purpose of its [the Commission's] existence is to find facts which may subsequently be used as the basis for legislative or executive action." 363 U.S. at 441. In Jenkins v. McKeithen, 1969, 395 U.S. 411, 89 S.Ct. 1843, 23 L.Ed.2d 404 the Court explicitly reaffirmed *Hannah,* but held that where a Louisiana Commission established to investigate criminal violations affecting labor-management relations made actual findings of guilt, due process required that the Commission afford a person being investigated the right to confront and cross-examine witnesses against him.

Applying *Hannah* and *Jenkins,* the Third Circuit has held that a New Jersey State Commission of Investigation is an investigative body, and that the full panoply of judicial procedures is there-

6. In a criminal case, a defendant may refuse to answer questions posed by the police or refuse to testify at his trial, and his silence may not be used against him. Of course, a government employee may refuse to respond to questions put to him by his superiors. However, his refusal to respond, after proper instructions, may be used as a basis for dismissal. See the thorough discussion of this point in Uniformed Sanitation Men Ass'n, Inc. v. Commissioner of Sanitation of the City of New York, 2 Cir. 1970, 426 F.2d 619 (Friendly, J.), cert. den. 406 U.S. 961, 92 S.Ct. 2055, 32 L.Ed.2d 349.

7. For discussion of an analogous problem in the field of labor law, see National Labor Relations Board v. J. Weingarten, Inc., 5 Cir. 1973, 485 F.2d 1135, cert. granted Apr. 29, 1974, — U.S. —, 94 S.Ct. 1990, 40 L.Ed. 2d 557, 42 USLW 3607, where this Court concluded that the failure to comply with an employee's request to have a union representative present at an interview initiated by the employer to investigate thefts did not constitute an unfair labor practice.

fore not required in hearings before the Commission. United States ex rel. Catena v. Elias, 3 Cir. 1972, 465 F.2d 765. Among other things, the New Jersey statute confers on the Commission the duty and power to conduct investigations in connection with the conduct of public officers and public employees, and of officers and employees of public corporations and authorities. Also, at the direction of the Governor or by resolution of the legislature, the Commission has the duty to conduct investigations concerning the removal of public officers, and the management or affairs of state agencies.

The November 20 proceeding was primarily investigative in nature. The proceeding was not a final agency determination, or adjudication, on whether Womer should be removed from his job. The question of removal was not decided on November 20. So far as the record reveals, the panel of agency officials also did not make any findings as to whether Womer was guilty of misconduct. The apparent sole purpose of the panel was to discover the facts, and to offer Womer an opportunity to respond to certain allegations.

█ The investigatory nature of the proceeding, in combination with a number of other factors, convinces us that Womer was not entitled to advance notice of the November 20 proceeding.

A factor which weighs heavily against Womer's claim is the nonfinality of the November 20 proceeding. On December 2, the Deputy District Engineer informed Womer by letter that he proposed to effect Womer's removal, and detailed the specific charges against him. The letter stated in part:

"5. You also have the right to reply to this notice of proposed adverse action personally, by appointment, and in writing within 10 working days after receipt. You may also furnish affidavits and witnesses in support thereof . . . . Full consideration will be given to a reply before final decision is made. As soon as possible after your answer is received, or after expiration of the 10 working day limit, if you do not answer, a written decision will be issued to you."

Thus, Womer had an opportunity to prepare his case and to present evidence and arguments, prior to the final agency decision on his removal. A primary purpose of notice is to provide a party an opportunity to prepare his objections and to present them to the tribunal before a final decision is made. In this case, Womer received notice of the charges against him on December 2 and replied to them in a letter on December 4. In a letter dated December 29, the District Engineer stated that he had given careful consideration to the information contained in Womer's letter, but had determined that the evidence supported the charges in the December 2 letter and warranted Womer's removal.[8] From this, we conclude that Womer received notice, and had an opportunity to present his case, before the agency made a final decision.[9]

A second consideration weighing against Womer's claim is that the November 20 proceeding was essentially noncriminal in nature. Proceedings which are a part of the process of guilt determination or criminal prosecution demand more rigorous procedural protections than are necessary in noncriminal proceedings.[10] The November 20

---

8. The Deputy District Engineer who wrote the December 2 letter to Womer was present at the November 20 proceeding. However, the District Engineer who made the final decision on Womer's removal was not present on November 20.

9. Womer also was "entitled to an evidentiary trial-type hearing at the appeal stage of the proceeding[s]," Arnett v. Kennedy, 1974, ——

U.S. ——, ——, 94 S.Ct. 1633, 1640, 40 L. Ed.2d 15 [42 USLW 4513, 4516, Apr. 16, 1974]. See 5 CFR §§ 771.208, 771.210–771.-212, 772.305 (1973).

10. This proposition is stated explicitly in Justice Frankfurter's concurring opinion in Hannah v. Larche, 1960, 363 U.S. at 488, and is in part the basis of Justice Douglas' dissenting opinion in *Hannah*, at 493 ff.

proceeding was concerned not with culpability under the criminal law, but with whether Womer had engaged in certain conduct which would draw in question his fitness and ability to continue to serve as a supervisory inspector. In fact, Womer's statements at the November 20 proceeding, and their fruits, could not have been used against him in a subsequent criminal prosecution, for the following reason: At the beginning of the November 20 proceeding, the presiding official remarked that the allegations of irregularities "are serious enough to warrant the dismissal of a government employee, specifically serious enough to warrant your dismissal." Womer could reasonably have construed this statement as a threat of removal from office if he failed to comment on the allegations and to rebut the allegations in some manner. In Garrity v. New Jersey, 1967, 385 U.S. 493, 500, 87 S.Ct. 616, 620, 17 L.Ed.2d 562, the Supreme Court held that "the protection of the individual under the Fourteenth Amendment against coerced statements prohibits use in subsequent criminal proceedings of statements obtained under threat of removal from office, and that it extends to all, whether they are policemen or other members of our body politic." [11] The protection of the individual under the Fifth Amendment, which is applicable in this case, is no less than that stated in *Garrity*. Our examination of the record indicates that Womer's comments were coerced by an implied threat that he would be dismissed if he did not reply in a satisfactory manner to the allegations which had been made.

Another consideration against requiring advance notice in this case involves the public interest. There is an extremely strong public interest favoring immediate investigation of allegations of misconduct on the part of public servants in the performance of their duties. Under all the circumstances of this case, including the possible burdens associated with giving advance notice, this public interest favors allowing the government agency to confront the employee with evidence of his wrongdoing, without providing prior notice of the investigation or of the precise allegations.

The panel of agency officials did tell Womer of the allegations against him at the beginning of the proceeding on November 20. Then, after a few preliminary general questions, Womer was shown copies of the checks allegedly issued to him by a government contractor. Thus, Womer was advised of the nature of the allegations, and of at least part of the evidence against him before he attempted to make a detailed explanation of the circumstances surrounding the issuance of the checks. We conclude that this notice provided at the beginning of the November 20 proceeding was consistent with the "rudiments of fair play," Chicago M. & St. P. R. Co. v. Polt, 232 U.S. 165, 168, 34 S.Ct. 301, 58 L.Ed. 554. Hannah v. Larche, 1960, 363 U.S. 420, 487, 80 S.Ct. 1502, 4 L.Ed.2d 1307 (concurring opinion of Frankfurter, J.), and that there was no violation of procedural due process.

### III.

Womer claims that when a government employee is questioned about job-related matters, and there is a substantial risk that he may lose his job and be subjected to criminal prosecution for actions connected with the subject of the

---

Also see Jenkins v. McKeithen, 1969, 395 U.S. at 427–431.

11. In Gardner v. Broderick, 1968, 392 U.S. 273, 276, 88 S.Ct. 1913, 1915, 20 L.Ed.2d 1082, the Supreme Court stated: "In that case [Garrity], we held that when a policeman had been compelled to testify by the threat that otherwise he would be removed from office, the testimony that he gave could not be used against him in a subsequent prosecution." In Uniformed Sanitation Men Ass'n v. Sanitation Comm'r, 1968, 392 U.S. 280, 284, 88 S.Ct. 1917, 1919, 20 L. Ed.2d 1089, the Court commented: "Garrity v. New Jersey, 385 U.S. 493 [87 S.Ct. 616, 17 L.Ed.2d 562] (1967), in which we held that testimony compelled by threat of dismissal from employment could not be used in a criminal prosecution of the witness . . . ." Also see Kalkines v. United States, Ct.Cl.1973, 473 F.2d 1391.

inquiry,[12] the officials conducting the inquiry must advise him of his options and the consequences of his choice before asking any questions or asking for any comments. Womer contends that he should have been advised along the lines of the warning given to certain New York City employees involved in Uniformed Sanitation Men Ass'n v. Commissioner of Sanitation, 2 Cir. 1970, 426 F.2d 619, cert. denied, 1972, 406 U.S. 961, 92 S.Ct. 2055, 32 L.Ed.2d 349:

> "I want to advise you, Mr. _____, that you have all the rights and privileges guaranteed by the Laws of the State of New York and the Constitution of this State and of the United States, including the right to be represented by counsel at this inquiry, the right to remain silent, although you may be subject to disciplinary action by the Department of Sanitation for the failure to answer material and relevant questions relating to the performance of your duties as an employee of the City of New York.

> "I further advise you that the answers you may give to the questions propounded to you at this proceeding, or any information or evidence which is gained by reason of your answers, may not be used against you in a criminal proceeding except that you may be subject to criminal prosecution for any false answer that you may give under any applicable law, including Section 1121 of the New York City Charter."

426 F.2d at 621.

■■ As discussed earlier, the presiding official remarked at the beginning of the November 20 proceeding that the allegations of irregularities "are serious enough to warrant the dismissal of a government employee, specifically serious enough to warrant your dismissal." On the basis of this implied threat of removal from office if he failed to respond, Womer's remarks and answers to questions at this inquiry could not be used against him in a criminal proceeding. Garrity v. New Jersey, 1967, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562. Also, if Womer had refused to answer any questions, without being told that his answers and the fruits thereof could not be used in criminal proceedings, there would be a serious question as to whether he could be removed from his job because of his failure to answer questions. Kalkines v. United States, Ct.Cl.1973, 473 F.2d 1391. However, neither of these situations is presented in this case, and we do not see how Womer has been injured in any way by the failure to explain these issues to him.

■ Although not specifically discussed, Womer's claim of insufficient advice apparently includes the failure to tell him that he could remain silent and could be represented by counsel. These warnings were not necessary. The interview on November 20 comes within the logic of Garrity v. New Jersey, *supra,* so that statements by Womer, and their fruits, could not have been used in a criminal proceeding. Since there was no possibility of Womer's statements being used against him in a criminal proceeding, there was no constitutional necessity for warnings of the sort required by Miranda v. Arizona, 1966, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. The logic of *Miranda* does not extend to proceedings such as these, which legally could have no effect in any criminal proceeding against Womer.[13] Even if

---

12. Womer, in his brief, asserts that the U. S. Attorney was conducting a criminal investigation involving the same facts and circumstances.

13. The Fifth Amendment provides that no person "shall be compelled *in any criminal case* to be a witness against himself." (Emphasis added.) The privilege against self-incrimination may be invoked in a civil or administrative proceeding, where an appropriate answer to a question might be self-incriminating. In this case, nothing said by Womer could have later been used against him in a criminal proceeding. In fact, so far as we are advised, no effort has been made to use anything said by Womer on November 20 in any subsequent criminal proceedings.

Womer's statements could have been used in a later criminal proceeding, there is serious question whether he would have been entitled to *Miranda* warnings. See Boulware v. Battaglia, D.Del.1972, 344 F.Supp. 889, 900–902, aff'm, 3 Cir. 1973, 478 F.2d 1398,[14] and United States v. Prudden, 5 Cir. 1970, 424 F.2d 1021, 1028.

### IV.

Womer contends that the regulation he allegedly violated was not promulgated until after the conduct in question occurred. This contention is without merit. Although AR 600–50 has been amended from time to time, a conflict of interest provision similar to the one issued on June 29, 1966 was included in the regulation issued on April 18, 1962 and also in the one issued on April 3, 1964.

 Womer challenges the sufficiency of the factual allegations which formed the basis of the charges leading to his removal. It is settled that the scope of judicial review of administrative agency removal decisions is limited. See Chiriaco v. United States, 5 Cir. 1964, 339 F.2d 588; Anonymous v. Macy, 5 Cir. 1968, 398 F.2d 317; Mc-Ghee v. Johnson, 10 Cir. 1969, 420 F.2d 445; Meehan v. Macy, 1968, 129 U.S. App.D.C. 217, 392 F.2d 822, 830; Hargett v. Summerfield, 1957, 100 U.S.App. D.C. 85, 243 F.2d 29, 32. We agree with the district court that "The record here reveals no evidence of abuse of discretion or capricious action in the dismissal of Mr. Womer."

Affirmed.

---

14. In *Boulware*, where the police department summoned certain officers to a departmental hearing concerning alleged criminal wrongdoing, the officers claimed they should have been given *Miranda* warnings. The Court replied, "The requirement to inform an individual arises only after he has been taken into custody in a criminal proceeding. *Id.* [United States v. Jaskiewicz, 3 Cir. 1970, 433 F.2d 415, cert. denied, 1971, 400 U.S. 1021, 91 S.Ct. 582, 27 L.Ed.2d 632, and United States v. White, 2 Cir. 1969, 417 F. 2d 89, cert. denied, 1970, 397 U.S. 912, 90 S.Ct. 910, 25 L.Ed.2d 92]. Thus, since the plaintiffs were subject to a civil investigation and had not been taken into custody, the defendants were not under an affirmative obligation to advise the plaintiffs of their *Miranda* warnings. See United States v. Prudden, 424 F.2d 1021, 1028 (5 Cir. 1970)." 344 F. Supp. at 902.